IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

EVERGREEN COMMUNITY POWER LLC   :        CIVIL ACTION
                                :
          v.                    :
                                :
RIGGS DISTLER & CO., INC.       :        NO. 10-728

MEMORANDUM

Bartle, J.                                      May 11, 2012

        Before the court is the motion of plaintiff Evergreen
Community Power LLC ("Evergreen") for attorneys' fees, costs, and
expenses.

        Evergreen sued Riggs Distler & Co. ("Riggs"), a pipe
installation contractor, for allegedly breaching the parties'
contract in connection with the construction of a power plant for
Evergreen in Reading, Pennsylvania.  Riggs filed a counterclaim
against Evergreen for failure to pay certain contract costs owed
to Riggs, among other counts.  The court tried this action
without a jury and after making Findings of Fact and Conclusions
of Law entered a judgment in favor of Evergreen and against Riggs
in the amount of $422,923.83.  The court also entered judgment in
favor of Evergreen and against Riggs on Riggs' counterclaim.
Evergreen now asserts that it is entitled to attorneys' fees,
costs, and expenses under the parties' contract and under the
Pennsylvania Contractor and Subcontractor Payment Act, 73 Pa.
Cons. Stat. Ann. § 501, et seq.

I.

Evergreen first argues that it is entitled to
attorneys' fees, costs, and expenses under the parties' contract.
Evergreen contends that the "General Terms and Conditions" which
Phoenix Technology Holdings ("Phoenix")[1] sent out to potential
bidders on the construction project as part of a "bid package"
dated December 20, 2007 became part of its contract with Riggs,
with certain exceptions not relevant here.  These General Terms
and Conditions contain a section which reads, "[s]ubcontractor
will pay Phoenix Technology Holdings all reasonable sum of
attorneys' fees, and all costs and expenses incurred by Phoenix
Technology Holdings in the enforcement of any of ECP's rights or
remedies hereunder."

The General Terms and Conditions, as noted, constituted
a part of the invitation to Riggs to bid.  On February 21, 2008,
Riggs made a written offer in response.  At the top of the
document was the title, "Evergreen Community Power - Phoenix
Project.  Piping Fabrication and Installation Bid Package.  Riggs
Distler Proposal # BI-0802-01 Bid Clarifications."  Below the
title was the following:  "[w]e certify that our proposal
complies with all Inquiry Documents and Specifications except for
the following."  The offer then listed thirteen items with
subparts describing what was being excluded.  Among the excluded
items was liquidated damages, which was one of Evergreen's damage

---

1.  The parties agree that for purposes of this lawsuit,
Evergreen and Phoenix are synonymous.

remedies provided in the General Terms and Conditions.  Thus, the February 21, 2008 offer made by Riggs, by certifying compliance with the "Inquiry Documents," included Evergreen's General Terms and Conditions except for any items such as liquidated damages which Riggs specifically excluded.

Representatives from Riggs and Evergreen later met to negotiate a contract.  Following negotiations, Riggs submitted a written proposal as a revised offer on April 1, 2008 "to perform the BOP Piping work scope at the Reading Pa. Evergreen Community Facility."  The offer provided for a total cost of $5,750,000.  It included a fixed fee of $550,000, and $250,000 for out of scope items.  Additional work scope items, including time and materials, would be billed at cost plus 10%.  Significantly, the revised offer stated, "[t]he original bid clarifications dated 2/21/08 still apply."  By using these words, Riggs incorporated the provisions of its earlier February 21, 2008 offer into its April 1, 2008 offer, including the provision concerning payment of Evergreen's attorneys' fees, expenses, and costs in the enforcement.  On April 2, 2008, Riggs supplemented its offer with a proposal which provided the labor rate costs for the pipefitters.

On April 3, 2008, Evergreen signed a purchase order accepting the April 1, 2008 and April 2, 2008 offers.  The purchase order stated:

> Piping supply and installation as per vendor's fixed fee proposal dated April 1, 2008.  Scope of work is to supply and install

piping as per bid documents and the following
drawings:  GA Rev A Dated 12/20/07; P&IDs Rev
D with 1st Addendum Dated 1/18/08; Piping
Drawings Rev C with 1st Addendum Dated
1/18/08; ISOs with 1st and 2nd Addendum Dated
1/18/08; Material List Rev A; And, Line List
Rev F Dated 2/11/08.  The schedule, as agreed
upon, is defined by the following milestones:
(1) mid to end July 2008 - boiler hydro test;
(2) by end of September 2008 - first fire and
steam blows of the boiler; and (3)
October 20, 2008 - project completion.  Labor
rates shall be as stated in Riggs Distler
proposal dated April 2, 2008.  (Emphasis
added.)

This purchase order incorporating the April 1, 2008 and
April 2, 2008 Riggs' proposals constituted a contract, and Riggs
began work on the installation of piping pursuant to its terms.
Thus, the language of the General Terms and Conditions that
required Riggs to pay any attorneys' fees, costs, and expenses
incurred by Evergreen in enforcing its rights was part of the
agreement.

Evergreen approved four additional purchase orders
following the April 3, 2008 contract.  Under the April 3, 2008
contract and the first three of these purchase orders, Evergreen
agreed to pay Riggs for time and materials expended, plus a fixed
fee.  On July 24, 2008, Evergreen approved a purchase order
responding to Riggs' proposal dated July 22, 2008 to add the
installation of boiler piping for the project.  The proposal
provided a fee of 10% of cost up to a target of $1,280,000, with
5% charged for cost above the target.  If the cost was below
$1,280,000 and the duration was less than 11 weeks, an additional
$20,000 plus 5% of the difference of the cost would be added to

-4-

the fee.  The purchase order stated that it was "as per Riggs Distler proposal dated 7/22/08."

On September 3, 2008, Evergreen approved a purchase order responding to Riggs' proposal dated September 2, 2008 to install small bore piping for the project.  The proposal provided a fixed fee of $100,000 with a target cost of $900,000.  There were additional fixed fee incentives and penalties.  Evergreen executed a September 23, 2008 purchase order, with no proposal attached, providing for an additional $3,000,000 for Riggs "to finish piping supply and installation per proposal dated April 1, 2008."  The work of Riggs continued in accordance with this purchase order.

In October 2008, Evergreen became concerned about Riggs' cost overruns.  Raja Mouracade, the President of Phoenix, told Riggs on behalf of Evergreen that it must either consent to a lump sum agreement and finish its scope of work by January 31, 2009 or it would be replaced by another subcontractor.  On October 27, 2008, Evergreen signed its final purchase order with Riggs - a document which, along with an addendum, has been called the lump sum agreement.[2]  This purchase order incorporated an October 24, 2008 proposal or offer by Riggs "to perform the remainder of BOP piping..."  The offer referenced a lump sum total of $17,009,269 for the project with $11,249,269 previously billed by Riggs and an additional payment of $5,760,000.  The

---

2.  This agreement is discussed thoroughly in the court's Findings of Fact and Conclusions of Law.

lump sum agreement stated that it was "per Riggs Distler Proposal
dated 10/25/08."[3]   The purchase order described the work to be
completed as the "BOP piping," the same description as used in
the April 3, 2008 contract.  The addendum to the October 27, 2008
purchase order, which was drafted by Mouracade of Evergreen and
signed by Riggs on October 29, 2008, stated:

> Riggs Distler & Co. undertakes to complete
> the full scope of work by end of January 2009
> if no additions are made to the agreed upon
> scope of work.  Failure to do so will entitle
> Evergreen Community Power to take any
> remedial action that will ensure completion
> of project and Riggs Distler & Co[.] agrees
> to deduct from this contract the value of any
> such remedial action Evergreen Community
> Power [sic].

Even though the lump sum agreement had a completion
date of January 31, 2009, Riggs did not finish its work until
May 17, 2009.  We found that additions were made to the agreed
upon scope of work which relieved Riggs of the January 31, 2009
deadline.  Evidence concerning the causes and responsibility for
the delay consumed much of the time of the trial.

Riggs argues that even if the attorneys' fees provision
was included in the April 3, 2008 contract, the October 27, 2008
purchase order incorporating the October 24, 2008 proposal and
October 29, 2008 addendum constituted a new contract or novation
and that the new contract did not include the counsel fee
provision.  Evergreen counters that the subsequent purchase

---

3.  A handwritten note circles that date of 10/25/08 and states
"change to proposal dated 10/24/08 JS 10/27/08."

orders, including the lump sum agreement, merely modified the
April 3, 2008 contract, and that contract, including the counsel
fees provision of the General Terms and Conditions, still
applies.

The party asserting a novation, that is, that a new
contract replaced an earlier contract, bears the burden of
proving that the parties intended to discharge the prior
contract.  See Melat v. Melat, 602 A.2d 380, 385 (Pa. Super. Ct.
1992).  Here, Riggs in order to prevail must establish that one
or more of the purchase orders following the April 3, 2008
contract was a novation.  "[A] novation may only be found where
the evidence demonstrates the displacement and extinction of a
valid contract, the substitution for it of a valid new contract,
a sufficient legal consideration for the new contract, and the
consent of the parties."  Id. at 384-85 (internal citations
omitted) (emphasis in original).  Parties to a contract may
always rescind it, modify it, or abandon it, and whether they
have agreed to do so is a matter of their intent.  See Kirk v.
Brentwood Manor Homes, Inc., 159 A.2d 48, 50-51 (Pa. Super. Ct.
1960).

The July and September proposals and purchase orders,
in our view, simply modified the April 3, 2008 contract by adding
more piping to Riggs' scope of work but did not displace the
prior contract.  The parties continued to operate as though under
the April 3, 2008 contract, and the September 23, 2008 purchase
order explicitly stated it was "per proposal dated April 1,

-7-

2008."  As for the October 29, 2008 lump sum agreement, its purpose was to change the payment structure of the contract from a fixed fee plus time and materials agreement to a lump sum agreement and to add a specific deadline for the completion of this work.  It set forth what had been previously billed by Riggs on the project since the April 3, 2008 contract, and it stated that the "[p]roposal include[d] transmittals thru 10/19/08."  The agreement accordingly incorporated the work Riggs had already done on the project and simply modified the April 3, 2008 contract.

        In addition, there is no evidence on the record that the parties ever discussed discharging the April 3, 2008 contract when they entered into the subsequent purchase orders, let alone that they consented to extinguishing the requirements under the General Terms and Conditions.  Riggs has not met its burden to prove that the parties intended that any of the purchase orders following the April 3, 2008 contract, including the lump sum agreement, was to be a novation.  Accordingly, the later agreements simply modified the April 3, 2008 contract, and the attorneys' fees provision in the General Terms and Conditions remained incorporated from the beginning into the contract between Riggs and Evergreen.

                                    II.

        In addition to Evergreen's breach of contract claim against Riggs, Riggs filed various counterclaims against Evergreen, including one breach of contract claim for "unpaid

contract costs" pursuant to the Pennsylvania Contractor and
Subcontractor Payment Act ("CSPA"), 73 Pa. Cons. Stat. Ann.
§ 501, et seq.  We found in favor of Evergreen on all of Riggs'
counterclaims.  Evergreen now argues that it is entitled to
attorneys' fees, costs, and expenses under the CSPA for its
successful defense.

The purpose of the CSPA is "to protect contractors and
subcontractors" and "to encourage fair dealing among parties to a
construction contract."  See Ruthrauff, Inc. v. Ravin, Inc., 914
A.2d 880, 890 (Pa. Super. Ct. 2006).  Under the CSPA, performance
by a contractor or a subcontractor in accordance with a contract
entitles the contractor or subcontractor to payment from the
party with whom it contracted.  See 73 Pa. Stat. Ann. § 504.  The
CSPA further provides, "[n]otwithstanding any agreement to the
contrary, the substantially prevailing party in any proceeding to
recover any payment under this act shall be awarded a reasonable
attorney fee in an amount to be determined by the court or
arbitrator, together with expenses."  73 Pa. Cons. Stat. Ann.
§ 512(b).

"[A] defendant is eligible for attorney fees under the
CSPA, but it is within the trial court's discretion to determine
if a defendant is a 'substantially prevailing party.'"  Zavatchen
v. RHF Holdings, Inc., 907 A.2d 607, 608 (Pa. Super. Ct. 2006).
In that case, the plaintiff had been awarded a verdict in the
amount of $300, which was less than one percent of the $89,369.33
in damages it had sought.  See id. at 609.  The Pennsylvania

-9-

Superior Court concluded that the defendants were not substantially prevailing parties since they "did not clearly prevail in the sense that a judgment was entered in their favor or that [the plaintiff's] claim was groundless or frivolous." Id. at 611 (citing Christiansburg Garment Co. v. EEOC, 434 U.S. 412, 433 (1978) and Profit Wize Mktg. v. Wiest, 812 A.2d 1270, 1275-76 (Pa. Super. Ct. 2002)).

The court analogized the CSPA to federal civil rights statutes under which defendants are deemed to be prevailing parties only if the plaintiff's claim was "groundless or frivolous."  It cited Christiansburg Garment, a civil rights case involving racial discrimination in employment, in which the United States Supreme Court held that a district court "may in its discretion award attorney's fees to a prevailing defendant in a Title VII case upon a finding that the plaintiff's action was frivolous, unreasonable, or without foundation, even though not brought in subjective bad faith."  434 U.S. at 421.

Evergreen contends that other courts in our district have read Zavatchen to provide that a defendant can be a substantially prevailing party merely by having judgment awarded in its favor, rather than by defending a groundless or frivolous suit.  See Eastern Electric Corp. of New Jersey v. Shoemaker Constr. Co., 657 F. Supp. 2d 545, 561-62 (E.D. Pa. 2009); Moravian Assocs., L.P. v. The Henderson Corp., No. 06-2165, 2008 U.S. Dist. LEXIS 62260, at *38-40 (E.D. Pa. August 14, 2008).  We disagree.

-10-

In Eastern Electric, the party which was awarded attorneys' fees was not the defendant on the relevant claim but rather the third-party plaintiff. See Eastern Electric, 657 F. Supp. 2d at *2-3. In Moravian, the plaintiff developers of a construction project had sued the defendant construction manager of the project in which they requested a declaratory judgment that they did not have an obligation to pay a debt to the construction manager under the terms of the parties' settlement agreement, which modified the parties' original construction contracts. 2008 U.S. Dist. LEXIS 62260, at *21. The court ruled in favor of the defendant construction manager, finding that it was owed payment by the plaintiff developers. Id. at *40. The defendant construction manager filed a counterclaim seeking attorneys' fees for its work in defending the matter under the CSPA. The court found that the defendant was entitled to the requested fees, without finding that the suit was groundless or frivolous. See id. The defendant, however, was the construction manager, which was the one entitled to payment for work done on the construction project. See id.

Our case is different. Here, Evergreen was a defendant on Riggs' claim for money under the CSPA and was not owed and did not seek any payment from Riggs for work it had done as a contractor for the construction of the power plant. Rather, the money awarded Evergreen in this action was for breach of contract as a result of Riggs' delay in completing the project.

Although we ruled in Evergreen's favor on the counterclaim, Riggs' claim against Evergreen under the CSPA was not groundless or frivolous.  Thus, Evergreen was not a "substantially prevailing party" as the defendant on Riggs' counterclaim as required for attorneys' fees to be awarded under the CSPA.

III.

We will now address what Riggs must pay Evergreen according to their contract.  As described above, the attorneys' fees provision in the contract states, "[s]ubcontractor will pay Phoenix Technology Holdings all reasonable sum of attorneys' fees, and all costs and expenses incurred by Phoenix Technology Holdings in the enforcement of any of ECP's rights or remedies hereunder."  Although this provision does not state that Evergreen must be the prevailing party to obtain attorneys' fees, we read the provision to imply that as part of the reasonableness requirement.  See McMullen v. Katz, 985 A.2d 769, 776 (Pa. 2009).  Courts applying Pennsylvania law "can find that contractual provisions for the shifting of attorney fees implicitly require that the claimed fees be reasonable, despite the lack of specific language...." McMullen, 985 A.2d at 775.  Here, the provision includes the term "reasonable," but does not limit recovery to the prevailing party.  In our view the provision implicitly requires Evergreen to be the prevailing party in order to recover counsel fees.  Otherwise, the award of the counsel fees would not be reasonable.  Furthermore, although we did not award Evergreen

-12-

attorneys' fees under the CSPA for its successful defense on Riggs' counterclaims under that statute, it seems reasonable that the parties' contract should be construed to provide Evergreen with attorneys' fees for its defense of Riggs' various counterclaims.  Through its effective defense, Evergreen enforced its right to pay Riggs only what was owed.

Evergreen requests $850,467.73 in attorneys' fees, costs, and expenses incurred in obtaining the judgment entered on January 20, 2012.  This sum is broken down into $679,655 for attorneys' fees and $170,812.73 in costs and expenses. Initially, we find that the hourly rates charged by Evergreen's attorneys were reasonable.  They were below the average billing rate for partners in the Philadelphia law firms surveyed by the National Law Journal in 2008, and they increased at a reasonable rate in the years thereafter.  Furthermore, it was reasonable to have two partners working on this case and attending trial, as the issues were complex and required both partners' time and skill.

Evergreen claimed at trial $4,356,520 in damages. After a seven day bench trial the court entered judgment in favor of Evergreen and against Riggs on all of Evergreen's claims and on all of Riggs' counterclaims.  However, the court awarded Evergreen $422,923.83, which was less than 10% of its claim.  We therefore find that although Evergreen was the prevailing party, its success was limited.  It would not be reasonable to award Evergreen its full request for attorneys' fees.

First, we will deduct from Evergreen's claimed attorneys' fees the time that Evergreen's counsel spent on its consequential damages claim.  Evergreen sought $2,560,372 in lost profits caused by Riggs' delay in the start-up of the power plant.  At trial, Evergreen called Pierre Fares, an in-house business and financial analyst to testify regarding these lost profits.  Fares began by determining the monthly gross sales Evergreen would generate when the biomass boiler would be running at maximum capacity.  This analysis was fatally flawed.  Except for about one month, the power plant had never continuously operated at maximum capacity.  Further, Evergreen presented no evidence about net sales with production at the plant's average capacity or about net sales based on historical data.  Under Pennsylvania law, consequential damages must be proven with reasonable certainty.  See Advent Sys. v. Unisys Corp., 925 F.2d 670, 680 (3d Cir. 1991).  Damages for alleged lost profits cannot be recovered where they are merely speculative.  See Delahanty v. First Pa. Bank, N.A., 318 Pa. Super. 90, 120 (Pa. Super. Ct. 1983).  In its Findings of Fact and Conclusions of Law, the court found that Evergreen had not proven its lost profits with reasonable certainty, and accordingly did not award it any of the requested $2,560,372 in consequential damages.

Evergreen should accordingly not be awarded counsel fees for the time its attorneys spent on its failed claim for consequential damages, which constituted approximately half of its damages claim.  At trial, Fares testified for less than a

full day.  His testimony was mainly about Evergreen's lost revenue damages, although he also performed some calculations relating to damages for having to pay other contractors to be on the site for a longer time due to Riggs' delay.  Thus, most but not all of the time Evergreen's attorneys spent preparing Fares for trial and his deposition, as well as the time related to his testimony as a witness at trial, should be excluded from the attorneys' fees award.  Furthermore, any time spent on briefing concerning Fares and any time spent on strategy regarding his testimony should be excluded.

The invoices of Evergreen's attorneys reveal that the attorneys began working on issues related to Fares' consequential damages analysis in September 2011.  From September 2011 to December 2011, the last month for which Evergreen submitted billing records, Evergreen's attorneys recorded $340,505 in time.  Looking at the attorneys' invoices, it is not possible to calculate the exact amount of time that the attorneys spent working on the consequential damages theory.  We find it reasonable to deduct 25% of this sum, that is, $51,075.75 as attributable to the attorneys' work on Fares' failed consequential damages theory.  Evergreen spent $477.70 on Fares' deposition transcript.  We will also deduct that cost from Evergreen's claims.

Evergreen of course has claimed attorneys' fees and expenses for the time that it spent proving the amount of delay caused by Riggs.  Evergreen asserted that Riggs delayed the

-15-

construction project by 94 days.  Evergreen's delay analysis

expert, Henry Rose, determined this period of delay.  Rose

testified on this delay analysis for a couple hours on the third

day of trial.  The court, in contrast to Rose's testimony, found

that any delay by Riggs did not cause damage to Evergreen until

after the installation of the vortex finder on April 27, 2009.

The court accordingly attributed 19 days of delay to Riggs, that

is, from April 28, 2009 to May 17, 2009, the date when Riggs

completed its work.  Because we did not credit all of Rose's

testimony on this topic, we will subtract 50% of his costs to

Evergreen and 50% of the amount of time that Evergreen's

attorneys spent on issues related to Rose's testimony on this

topic, including his deposition and trial preparation.

        Rose worked for Hill International.  Evergreen's

billing records from Hill International totaled $144,214.64.

However, this includes some costs for Robert Dieterle, who acted

as a rebuttal witness to Riggs' expert, Stephen Weathers.  The

court credited Dieterle's testimony in its Findings of Fact and

Conclusions of Law, and we therefore do not wish to deduct his

costs.  The costs specifically attributed to Dieterle total

$32,783.83.  In addition, we will not subtract any costs clearly

attributed to Rose's work on the rebuttal to Weathers, that is,

$23,220.  Accordingly, of the $144,214.64 in costs that Evergreen

claims from Hill International, we find that $88,210.81 in costs

were attributable to Rose's delay testimony and thus subtract

50%, that is $44,105.41, from what Riggs must pay under the

-16-

parties' contract.  Evergreen also spent $814.85 on Rose's and Dieterle's deposition transcript.  We will assume half this cost was regarding Rose's delay testimony and accordingly remove 50% of that sum, that is $203.72, from the sum Rigs must pay Evergreen.

As for the attorneys' fees attributable to Rose's delay testimony, Evergreen's attorneys appear to have engaged Rose in June 2011.  From June 2011 until December 2011, Evergreen's attorneys charged their client $515,015.00.  As with the attorneys' fees related to the consequential damages, it is not possible to calculate the exact amount of time that the attorneys spent working with Rose on matters regarding the delay testimony. We find it reasonable to deduct 15% of the attorneys' fees beginning in June 2011 as attributable to the portion of Rose's delay testimony that we did not credit.  This sum is $77,252.25.

In addition to Rose's expert testimony on the number of days of delay caused by Riggs, Evergreen presented fact witnesses who testified about this delay and its causes.  Specifically, Evergreen called Chady Zablit, the Chief Engineer for Phoenix; Stephen Frost, who was the head of the construction department at ESI; Charles Fehali, who was the person at Interstate Resources, a company affiliated with Evergreen, in charge of the project; and Karim Frem, the Phoenix Project Engineer for the project. Thus, Evergreen's only witness who did not testify about delay was Mouracade.  These fact witness devoted a substantial amount of time to testifying about Riggs' delay to the project, and it

is reasonable to assume that Evergreen's attorneys accordingly spent a substantial amount of time on work related to this testimony.  Because we did not credit the full amount of delay to which they testified, we deduct 25% of the remainder of attorneys' fees claimed by Evergreen.  Thus far, we have deducted $128,328 from Evergreen's claimed attorneys' fees of $679,655.  Accordingly, $551,327.50 remains.  We will now subtract 25% of that remainder, that is, $137,831.75.

To summarize these calculations, we will deduct $44,786.83 from Evergreen's claimed costs and $266,159.75 from Evergreen's claimed attorneys' fees.  Accordingly, we will award Evergreen $539,521.15 for their total attorneys' fees, costs, and expenses.